UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CAROL O'NEAL, as Personal Representative of the Estate of Lanny O'Neal, Deceased,<br><br>            Plaintiff,<br><br>    vs.<br><br>REMINGTON ARMS COMPANY, L.L.C., SPORTING GOODS PROPERTIES, INC., and E.I. DUPONT DE NEMOURS AND COMPANY,<br><br>            Defendants. | 4:11-CV-04182-KES<br><br><br>ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY AND MOTION FOR SUMMARY JUDGMENT |

Defendants, Remington Arms Company, LLC, Sporting Goods Properties, Inc., and E.I. Dupont De Nemours and Company, move the court to disqualify Charles Powell as an expert witness for plaintiff, Carol O'Neal. Defendants also move the court for summary judgment on all of O'Neal's claims. O'Neal resists the motion.[1] For the following reasons, the court denies the motion to exclude Powell as an expert and denies the motion for summary judgment.

## PROCEDURAL HISTORY

O'Neal is the widow and personal representative of the estate of Lanny O'Neal. The defendants are entities in the business of selling firearms. O'Neal brought an action against defendants after Lanny was shot and killed in a hunting

---

[1] As described more fully below, defendants filed a single motion styled as a "renewed motion for summary judgment and *Daubert* motion to exclude plaintiff's liability expert." Docket 94. Thus, the court refers to defendants' combined arguments as a single motion.

accident on November 9, 2008. The firearm involved in the accident was a Remington Model 700 rifle. O'Neal sued defendants alleging strict liability (product defect), strict liability (failure to warn), negligent design and manufacture, negligent failure to warn, and spoliation of evidence. Docket 1. O'Neal's spoliation claim was dismissed following a motion by defendants because it is not an independent cause of action. Docket 36.

The parties submitted several motions after discovery concluded.[2] O'Neal moved for partial summary judgment on the issue of product defect, arguing issue preclusion applied. Defendants moved to exclude Powell's testimony and for summary judgment on all of O'Neal's claims. The court denied O'Neal's motion for summary judgment and granted defendants' motion for summary judgment. Docket 81. Because the court granted defendants' motion for summary judgment, the court denied defendants' motion to exclude Powell's testimony as moot. *Id.* O'Neal moved the court to reconsider its order. The court denied the motion. Docket 86. O'Neal appealed.

The Eighth Circuit Court of Appeals reversed and remanded. *O'Neal v. Remington Arms Co., LLC*, 803 F.3d 974 (8th Cir. 2015). The Eighth Circuit concluded that the record contained sufficiently disputed material facts to preclude entry of summary judgment in defendants' favor. *Id.* at 982. On remand to this court, defendants renewed their motion to exclude Powell's testimony and their motion for summary judgment on all of O'Neal's claims.

_____

[2] Defendants moved for summary judgment prior to the close of discovery. Docket 25. The court denied the motion. Docket 39.

**I.    Defendants' Motion to Exclude Powell's Testimony**

**LEGAL STANDARD**

In diversity cases, federal law controls whether expert testimony is admissible. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702. Under Rule 702, the trial court acts as a "gatekeeper" by screening a party's proffered expert testimony for its reliability and relevance. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.").

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (quoting *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999)). "The rule clearly 'is one of admissibility rather than exclusion.' " *Id.*

3

(quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)). Thus, "[t]he exclusion of an expert's opinion is proper only if it is 'so fundamentally unsupported that it can offer no assistance to the jury[.]' " *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

The Eighth Circuit has determined that a district court should apply a three-part test when screening expert testimony under Rule 702.

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon*, 270 F.3d at 686 (internal citations and quotations omitted). With respect to relevancy, expert testimony will be relevant and helpful to the jury if it concerns matters beyond the general knowledge of average individuals. *See United States v. Shedlock*, 62 F.3d 214, 219 (8th Cir. 1995). With respect to an expert's qualifications, Rule 702 recognizes five bases for qualifying an expert, which include "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Significantly, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006).

To satisfy the reliability requirement, the party offering the expert testimony must show by a preponderance of the evidence "that the methodology underlying [the expert's] conclusions is scientifically valid." *Barrett v. Rhodia, Inc.*, 606 F.3d

4

975, 980 (8th Cir. 2010). In making the reliability determination, the court may

consider: (1) whether the theory or technique can be or has been tested; (2)

whether the theory or technique has been subjected to peer review or publication;

(3) whether the theory or technique has a known or potential error rate and

standards controlling the technique's operations; and (4) whether the theory or

technique is generally accepted in the scientific community. *Russell v. Whirlpool*

*Corp.*, 702 F.3d 450, 456 (8th Cir. 2012). Additional factors to consider include:

"whether the expertise was developed for litigation or naturally flowed from the

expert's research; whether the proposed expert ruled out other alternative

explanations; and whether the proposed expert sufficiently connected the proposed

testimony with the facts of the case." *Polski v. Quigley Corp.*, 538 F.3d 836, 839

(8th Cir. 2008). "This evidentiary inquiry is meant to be flexible and fact specific,

and a court should use, adapt, or reject" these factors as the particular case

demands. *Russell*, 702 F.3d at 456.

Also when making the relevance inquiry, the court should focus on

"principles and methodology, not on the conclusions that they generate." *Kuhn v.*

*Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (citing *Daubert*, 509 U.S. at 595). At

times, conclusions and methodology are not entirely distinct from one another,

and the court " 'need not completely pretermit judicial consideration of an expert's

conclusions.' " *Id.* (quoting *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d

11, 15 (1st Cir. 2011)).  But "[a]s a general rule, the factual basis of an expert

opinion goes to the credibility of the testimony, not the admissibility, and it is up

to the opposing party to examine the factual basis for the opinion in cross-

examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (internal quotations omitted).

District courts have discretion in determining whether to admit expert witness testimony under Rule 702. *See In re Air Crash at Little Rock Ark., on June 1, 1999*, 291 F.3d 503, 509 (8th Cir. 2002). "That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." *Kumho Tire Co.*, 526 U.S. at 152. Nonetheless, the proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

## DISCUSSION

There is no genuine dispute that Powell is qualified to express an expert opinion or that his opinion is relevant. Regarding Powell's qualifications, he is a professional engineer who has performed material failure analyses for a number of years. He described his work as "the evaluation of failed components to determine the underlying causes of the failure[.]" Docket 48-7 at 33. Powell has held several teaching positions related to his field and has worked on engineering projects for private and governmental agencies. Docket 48-8 at 3. Powell estimated that he has served as an expert and performed failure analyses in approximately fifty cases involving firearms. Docket 48-7 at 19. Thus, the court finds that Powell is qualified to serve as an expert.

As to relevance, expert testimony is ordinarily required in product liability actions. *Burley v. Kytec Innovative Sports Equip., Inc.*, 737 N.W.2d 397, 407 (S.D. 2007). Whether a plaintiff's theory is based on strict liability or negligence, expert

6

testimony is generally necessary to establish that a product is defective and that the defect proximately caused the plaintiff's injury. *Id.* at 7-11; *see also Nationwide Mut. Ins. Co. v. Barton Solvents, Inc.*, 855 N.W.2d 145, 151 (S.D. 2014) ("Expert testimony is generally necessary to establish elements of negligence and strict liability"). Powell explained that he would testify to the defects he has identified in the subject rifle and the cause of the shooting incident. Docket 48-7 at 3. Thus, the court finds that Powell's testimony is relevant.

Regarding reliability, O'Neal argues that the Eighth Circuit resolved this issue in her favor because the Eighth Circuit cited portions of Powell's testimony and Powell's report in its opinion. The court disagrees. This court did not address previously whether Powell's testimony was admissible. Powell's testimony and his report were, therefore, considered as evidence and part of the summary judgment record before the Eighth Circuit. The Eighth Circuit noted that "Remington disputes most (if not all) of Powell's opinions and testimony, as well as other facts in the record," but the court was "obligated to view them in the light most favorable to O'Neal, the non-moving party." *O'Neal*, 803 F.3d at 975 n.1. The Eighth Circuit cited portions of Powell's testimony and his report for the purpose of determining whether the record contained sufficient circumstantial evidence to defeat defendants' motion for summary judgment. *See id.* at 981 ("for our purposes in reviewing the grant of summary judgment, we agree with O'Neal that the reasonable inferences supported by this record require us to reverse and remand for further proceedings."). But the Eighth Circuit explicitly declined to rule on the admissibility of Powell's testimony and, instead, directed this court to address the

issue in the first instance. *Id.* at 981. Thus, the Eighth Circuit did not hold that Powell's testimony is reliable or otherwise admissible.

Defendants argue primarily that Powell's opinions are unreliable because he cannot rule out alternative causes of the accident and that his testimony does not fit with the facts of the case. They argue that Powell's opinion boils down to speculation. For purposes of defendants' motion to exclude Powell's testimony, the court considers only whether the testimony is admissible and does not consider whether it is sufficient to prove an element in O'Neal's case. *See Daubert*, 509 U.S. at 596 (noting the difference between admissibility and sufficiency).

### A.    The Remington Model 700 Rifle

There is no dispute that the rifle involved in Lanny's death was a Remington Model 700 rifle. Because Powell's testimony concerns several working parts of the rifle, the court will describe briefly its relevant components.[3] The rifle at issue here was manufactured in 1971. Model 700 rifles manufactured at that time were assembled with what is known as the "Walker" fire control system. For purposes of this dispute, the relevant parts of the Walker fire control system are the trigger, the connector, the sear, and the safety lever.

The connector is an elongated U-shaped piece of metal located in front of the trigger. The sear is an independent piece of metal that interacts with the connector and the firing pin. When the rifle is not being fired, the bottom tip of the sear rests on and is supported by the top rear of the connector. The sear also restrains the firing pin. When the trigger is pulled, the connector is pushed forward and the

---

[3] Both parties' proffered experts have described the role of these components. *See* Docket 48-6; Docket 48-8.

bottom tip of the sear is allowed to fall behind the connector. This action releases the firing pin, which allows the rifle to fire a cartridge. When the safety is in the "safe" or "on" position, it physically lifts and restrains the sear away from its engagement point with the connector. When the safety is moved to the "fire" or "off" position, the sear is returned to its engagement point with the connector.

### B.    Powell's Analysis and Opinion

Powell concluded that the Remington Model 700 rifle was defective and that the defect caused the accident that killed Lanny. He reviewed internal documents from Remington, several reports generated by law enforcement officers who investigated the incident, the known history of the rifle, and statements from witnesses. Docket 48-7 at 8, 9, 13, 14, 23-25. Powell also relied on his own knowledge and experience from performing failure analyses in approximately fifty other cases involving firearms, some of which also involved Remington rifles. *Id.* at 19.

The South Dakota Supreme Court has found that there are three general categories of product defects: (1) design defects; (2) manufacturing defects; and (3) improper warnings. *Peterson v. Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 912 (S.D. 1987). A design defect theory alleges that a product was constructed as intended, but the entire design line is defective. *Id.* A manufacturing defect theory alleges that an individual product was *not* constructed as intended and that the deviations in the individual product's construction render it defective. *Id.* An improper warning theory alleges that an otherwise properly designed and

manufactured product is nonetheless hazardous because it lacks adequate instructions or warnings as to its use. *Id.*

Powell testified that all Model 700 rifles manufactured at the time with the Walker fire control system are defective. Docket 48-7 at 32. He opined, for example, that because the connector separates briefly from the trigger every time the rifle is fired, the period of separation allows for deposits such as dirt, corrosion, or condensation to build up between the trigger and the connector. Docket 48-8 at 5. These interferences can lead to misfires. *Id.* at 5-6. Moreover, because the fire control components are enclosed in a riveted housing, users cannot easily inspect the connector's engagement with the sear. *Id.* at 7.

Because Powell testified that this alleged defect would infect the entire product line, it is a design defect theory. *Peterson*, 400 N.W.2d at 912. But Powell acknowledged that he could not testify with certainty that this alleged design defect caused the accident in this case. *See* Docket 48-7 at 32. Specifically, he testified as follows:

> Q:    You agree, though, that you cannot offer an opinion to a reasonable degree of certainty in the O'Neal case that the design defect caused or contributed to cause this shooting?
>
> A:    Correct.

*Id.*

Alternatively, however, Powell testified that the specific rifle involved in this case was defective. He opined that many of the older Model 700 rifles fired inadvertently when the user toggled the safety from the "on" to the "off" position. Docket 48-8 at 6. Powell testified that Remington acknowledged by 1979 that

10

about 1% of the approximately 2,000,000 Model 700 rifles manufactured prior to 1975 (*i.e.*, 20,000 rifles) were defectively made. *Id.* More specifically, those defective rifles were manufactured with what Powell termed "inadequate sear lift." Docket 48-7 at 31. Powell described the defect as "an insufficient clearance between the sear and the connector such that if the safety is on and you pull the trigger, the connector will get trapped in front of the sear and [be] allowed to drop." *Id.* at 4. Powell believed that the subject rifle was one of the 1% of Model 700 rifles that were manufactured before 1975 that were defectively made. *Id.* Thus, it is a manufacturing defect theory. *Peterson*, 400 N.W.2d at 912.

Powell explained the basis for his opinion. He testified that the rifle's serial number demonstrated that it was manufactured prior to 1975 and therefore within the bevy of rifles susceptible to the 1% defect. Docket 48-7 at 8. He explained that the 1% defect also tended to manifest itself randomly. Because the misfire that killed Lanny appeared to be the first reported incident of the rifle misfiring, Powell believed that the lack of other occurrences supported his conclusion that the rifle in this case was manufactured with the 1% defect. *Id.* at 9. Also, Mark Ritter, the individual who handled the gun at the time of the accident, testified that the rifle discharged when he moved the safety from the "on" to the "off" position. Docket 48-1 at 24. Powell explained that Ritter's testimony supported his conclusion that the rifle had the 1% defect because the defect allowed Model 700 rifles to discharge when the safety was toggled from the "on" to the "off" position. Docket 48-7 at 31.

Powell acknowledged that he was unable to examine the rifle because it had been destroyed. Docket 48-7 at 4. And because he could not examine the rifle,

Powell further acknowledged that he could not determine definitively the amount of sear lift actually present in the rifle at the time of the accident. *Id.* But Powell explained that he was reasonably certain that his theory fit the circumstances of the case. He testified as follows:

> Q:    Okay. And is it your opinion that at the time of this shooting this particular model 700 rifle had inadequate sear lift?
>
> A:    I think that is the best explanation of what occurred.
>
> Q:    Is that your opinion to a reasonable degree of certainty?
>
> A:    Yes.

*Id.* at 4.

### C.    Ruling Out Other Causes

Defendants argue that Powell did not adequately rule out other possible causes of the accident. They argue that there are many other explanations for the accident that do not support Powell's theory. Defendants also argue that because the rifle was destroyed, it is impossible to determine whether the rifle was, in fact, defective.

First, Powell was asked whether a misfire could occur due to an owner's improper alteration or adjustment of the rifle's fire control system. Powell agreed that that could cause misfires. Docket 48-7 at 11. And Powell agreed that because he could not inspect the rifle, he could not be certain whether the fire control system was improperly altered or adjusted. *Id.* But Powell did not believe that this scenario explained the cause of the accident. Rather, he testified that no one who possessed the rifle acknowledged adjusting or altering the fire control system. *Id.* at 12. And he explained that if the fire control system had been improperly altered

12

or adjusted, then there should have been more reported problems of the rifle misfiring rather than the one occasion that led to Lanny's death. *Id.* at 11-12.

Second, Powell was asked whether improper maintenance, abuse, or neglect of the rifle could cause it to misfire. Powell agreed that that could also cause misfires. *Id.* at 33. Likewise, Powell agreed that if some of the parts in the fire control system were broken, then those broken parts could cause misfires. *Id.* at 18. And Powell acknowledged that he could not definitely rule out this potential cause because he could not examine the rifle. *Id.* at 18, 33. But Powell explained that there was no evidence that suggested the rifle had been improperly maintained, abused, or neglected. *Id.* at 33. Similarly, he was unaware of any evidence suggesting that parts of the rifle's fire control system were broken. *Id.* at 18. Powell also explained that law enforcement briefly examined the rifle after the accident. *Id.* None of the officers noted the presence of broken parts or that the rifle showed signs of neglect. *Id.*

Third, Powell was asked whether replacing the Walker fire control system with an after-market trigger mechanism could cause misfires. Powell agreed that if the after-market trigger mechanism was itself defective, then that could cause misfires. *Id.* at 17. Powell further agreed that liability would likely lie with the manufacturer of the after-market trigger mechanism. *Id.* at 18. And Powell again acknowledged that he could not inspect the rifle to determine whether the original Walker fire control system had ever been replaced. *Id.* But Powell explained that there was no evidence suggesting that the Walker fire control system had ever

13

been replaced and, in Powell's opinion, Ritter's description of the accident was consistent with documented problems with the Walker fire control system. *Id.*

Fourth, Powell was asked whether it was possible that the rifle did not misfire at all. That is, whether the rifle fired because Ritter pulled the trigger while the safety was in the "off" position. Powell acknowledged that that scenario would not be indicative of a defect. *Id.* at 35. But Powell explained that based on Ritter's testimony, he believed that the rifle fired when Ritter moved the safety from the "on" to the "off" position. *Id.*

The common ground shared by all of defendants' arguments is that Powell cannot exclude definitively other potential causes of the accident that are unrelated to a manufacturing defect theory. Under South Dakota law, a plaintiff can rely on circumstantial evidence to support a products liability cause of action. *Crandell v. Larkin & Jones Appliance Co.*, 334 N.W.2d 31, 34 (S.D. 1983). And the plaintiff need not "eliminate all other possible explanations of causation that the ingenuity of counsel might suggest. It is sufficient that plaintiff negate his own and others' misuse of the product." *Id.* Thus, the "[p]roponents of expert testimony need not demonstrate that the assessments of their experts are correct, and trial courts are not empowered 'to determine which of several competing . . . theories has the best provenance.' " *Kuhn*, 686 F.3d at 625 (quoting *Milward*, 639 F.3d at 15). Rather, "it is [O'Neal's] burden to show that [Powell] arrived at his . . . opinion in a scientifically sound and methodological fashion." *Id.* at 626. Moreover, "[the reliability] requirement cannot be carried to a quixotic extreme." *Lauzon*, 270 F.3d at 693. "[A]n expert's causation conclusion should not be excluded because he or

14

she has failed to rule out *every* possible alternative cause." *Id.* (emphasis in original) (internal quotation omitted). "[The expert] need only be able to explain why other conceivable causes are excludable. [The opponent] may attack [the expert's] explanations of causation on cross examination, thereby requiring [the expert] to offer valid explanations as to why his conclusion remains reliable." *Id.* at 694; *see also Bonner*, 259 F.3d at 929 ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.").

Here, Powell explained that approximately 1% of the Model 700 rifles manufactured before 1975 were constructed with a manufacturing defect. And he concluded that the rifle in this case was one of those defectively manufactured rifles and that the defect caused the accident that killed Lanny. Powell relied on evidence in the record and his own skill and experience to arrive at his position. Although Powell agreed that he could not be absolutely certain about his conclusion, he also explained why he did not believe that any of the alternatives posed by defendants caused the accident. The court finds that Powell has offered sufficient justifications for his beliefs that those other conceivable causes are excludable. It is not for this court to determine which of several competing theories explaining the accident has the best provenance. Rather, the jury must decide whether to believe Powell's causation theory, and defendants are free to attack Powell's explanations through cross examination.

### D.    Sufficient Connection to the Facts of the Case

Defendants argue that Powell's theory does not fit the facts of the case. According to Powell's description of the manufacturing defect, a rifle with

15

inadequate sear lift would not misfire simply because the user toggled the safety from the "on" to the "off" position. Rather, the trigger also must be pulled at some point prior to toggling the safety. Docket 48-7 at 9-10. Powell's testimony is as follows:

> Q:   When I said something prerequisite to it happening, that's what I was referring to. It's not just the safety being on and the gun having been cocked and somebody flipping the safety off and the gun firing. It's the safety being on, the trigger being depressed --
>
> A:   While it's on safe.
>
> Q:   --while it's on safe and then the safety being released?
>
> A:   Correct.

*Id.* at 10.

Defendants argue that the record does not support Powell's theory. They point to Ritter's testimony. Ritter testified that he was sure he did not pull the trigger at any time while he was handling the rifle. Docket 48-1 at 17. Ritter also did not think the trigger was pulled inadvertently by anyone or anything else. *Id.* He testified that he was "very positive" about his recollection. *Id.* at 19. Powell acknowledged that he could not pinpoint when the trigger was pulled. Docket 48-7 at 10. But Powell believed that the trigger must have been pulled at some time after the rifle was loaded and that it was "the best explanation for what caused the fire-on-safe release." *Id.*

Assuming Ritter's memory of his own actions is accurate, his testimony does not rule out the possibility that the trigger was pulled at another time by either an object or another hunter. Powell testified that the trigger could have been pulled at

16

any time after the rifle was loaded for the defect to manifest itself. Docket 48-7 at 10. And he explained that the trigger could have been pulled by accidental means, such as getting caught on an object or moved by an unaware individual. *Id.* at 35.

Ritter explained that he received the rifle from Lanny after Ritter's own rifle malfunctioned the previous day. *Id.* at 17. Ritter testified that the rifle was already loaded when he took possession of it and that the safety was on. *Id.* at 19, 20. He explained that he did not keep the rifle in a case while the hunters drove around looking for deer, but rather he kept it "propped on the seat in between [himself] and the other passenger." *Id.* at 22. Ritter recalled that the rifle remained fully loaded during the hunt. *Id.* Ritter acknowledged that keeping a loaded rifle in such a position was not necessarily in compliance with firearm safety guidelines, but he asserted that it is a common practice for hunters in South Dakota. *Id.* at 23. He recalled moving the rifle in and out of the vehicle several times without unloading it. *Id.* Ritter also testified that he did not have possession of the rifle every time he got in and out of the vehicle. *Id.* at 22. And although Ritter testified that he consumed a single beer for lunch, he acknowledged that several beer cans and open bottles of hard liquor were later found in the vehicle on the day of the accident. *Id.* at 18.

Ritter's testimony, therefore, does not rule out the possibility that the trigger was pulled prior to him receiving the rifle from Lanny. As Powell testified, it did not matter when the trigger was pulled as long as it was pulled prior to the time the safety was toggled from the "on" to the "off" position. Likewise, the manner in which the rifle was kept inside the vehicle allowed for the possibility that someone

or some object depressed the trigger. And because Ritter acknowledged that he did not possess the rifle at all times, he cannot testify with certainty that none of the other hunters depressed the trigger.

While the events leading up to the accident and the destruction of the rifle create several unknowns, expert opinions "must be supported by appropriate validation–*i.e.*, 'good grounds,' based on what *is* known." *Daubert*, 509 U.S. at 590 (emphasis added). What is known is that the subject rifle was manufactured during a time when approximately 1% of Model 700 rifles were constructed with a manufacturing defect and that the rifle discharged in a manner that could be indicative of that defect. The record contains at least some circumstantial evidence supporting Powell's theory. The Eighth Circuit has admonished district courts that the better practice in close cases is to give the jury the opportunity to pass on the proffered expert opinion evidence. *Lauzon*, 270 F.3d at 695. The court will follow that practice here.

Based on the Rule 702 factors identified by the Eighth Circuit, the court finds that Powell is qualified to provide an expert opinion and that his opinion would be relevant and reliable. Thus, defendants' motion to exclude Powell from testifying is denied.

## II.    Defendants' Motion for Summary Judgment

As discussed, defendants moved previously for summary judgment on all of O'Neal's claims. They asserted three theories. First, that if Powell's testimony is excluded, then O'Neal's claims must fail. Second, that O'Neal could not establish a *prima facie* case for any of her product liability claims. And third, that summary

18

judgment should be entered in defendants' favor as a spoliation sanction because O'Neal destroyed the subject rifle. This court granted summary judgment in defendants' favor on the *prima facie* case theory, and the Eighth Circuit reversed. Defendants now ask the court to enter summary judgment in their favor on either of the two unadjudicated theories.

## BACKGROUND

The pertinent facts,[4] viewed in the light most favorable to O'Neal, the nonmoving party, are as follows:

On November 9, 2008, Lanny O'Neal was deer hunting with friends near Eagle Butte, South Dakota. Lanny loaned Ritter, one of the hunters, a Remington Model 700 rifle to use for hunting that day. Lanny was accidentally shot and killed while Ritter was handling the rifle. O'Neal alleges that the rifle was defective and that the defect was the reason the rifle discharged, causing the death of her husband.

The rifle was manufactured in 1971. Doug Swanson, Lanny's step-father, acquired the rifle in the early-to-mid 1980s from the estate of his mother's boyfriend, Albert Mcilvenna. Swanson does not know when or how Mcilvenna acquired the rifle. Swanson occasionally lent the rifle to Shawn O'Neal, Lanny's brother. Neither Swanson nor Shawn adjusted or modified the rifle during the times that they possessed it. Neither individual had a gunsmith inspect the rifle or

---

[4] Because the two grounds asserted in defendants' motion for summary judgment do not concern the evidence supporting O'Neal's products liability claims, a detailed recitation of the facts underlying those claims is not necessary.

work on it. Lanny acquired the rifle in approximately 2005 or 2006 and possessed it until the day he lent it to Ritter.

Following Lanny's death, Shawn contacted the law firm of Robins, Kaplan, Miller & Ciresi, LLP (Robins Kaplan), in Minneapolis, Minnesota. In December 2008, Shawn and O'Neal met with attorney Chris Messerly of Robins Kaplan to discuss the circumstances of Lanny's death. After this meeting, Robins Kaplan acquired the rifle from the FBI but never had the rifle inspected. On March 26, 2010, O'Neal and her friend, Joe Weir, an FBI agent, retrieved the rifle from Robins Kaplan after it was determined that no legal action would be taken by Robins Kaplan on behalf of O'Neal. O'Neal then asked Weir to destroy the rifle because she did not want the rifle that killed her husband to be in her house. Weir complied with O'Neal's request and destroyed the rifle.

O'Neal brought this product liability action against defendants on December 9, 2011, after hearing about a news report detailing certain problems with Remington rifles.

## LEGAL STANDARD

Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

20

(1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law.' " *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

The court applies the standard and burden associated with the applicable substantive law to determine whether a genuine issue for trial exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). South Dakota substantive law applies in this diversity action. *Hammonds v. Hartford Fire Ins. Co.*, 501 F.3d 991, 996 n.6 (8th Cir. 2007).

## DISCUSSION

### A.   Expert Testimony

Expert testimony is ordinarily required in product liability cases. *Burley*, 737 N.W.2d at 407. Defendants argue that if the court grants their motion to exclude Powell's testimony, then O'Neal's products liability claims must fail because Powell is her only expert. Because the court denied defendants' motion to

21

exclude Powell's testimony, the court denies defendants' motion for summary

judgment on this issue.

### B.    Spoliation Sanction

Defendants argue that summary judgment should be entered in their favor

because O'Neal destroyed the subject rifle. The four remaining claims in O'Neal's

complaint are strict liability (product defect), strict liability (failure to warn),

negligent design and manufacture, and negligent failure to warn. Under South

Dakota law, each theory requires O'Neal to prove that the rifle was in a defective

condition and that the defective condition was the legal cause of the accident.

*Burley*, 737 N.W.2d at 408-10 (providing the elements of strict liability and

negligent product defects theories); *Peterson*, 400 N.W.2d at 912; *Crandell*, 334

N.W.2d at 34. Defendants argue that because the rifle was destroyed prior to the

instigation of this lawsuit, they cannot defend themselves fully against O'Neal's

product liability claims. For example, defendants argue that because the rifle

cannot be examined, they cannot address adequately whether the rifle was

defective when it left defendants' control or whether the rifle ever underwent a

substantial, unforeseeable change. According to defendants, the prejudice flowing

to them warrants summary judgment in their favor as a type of spoliation sanction

against O'Neal.

In diversity cases, "federal law applies to the imposition of sanctions for the

spoliation of evidence." *Sherman v. Rinchem Co., Inc.*, 687 F.3d 996, 1006 (8th Cir.

2012); *see also Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875 (8th Cir. 2015)

(instructing district courts to apply federal law in diversity cases to the issue of

giving an adverse inference instruction based on spoliation of evidence). "Prejudice, bad faith, and evidence of an effort to suppress the truth are all required to impose a sanction of dismissal based upon spoliation." *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 924 n.1 (8th Cir. 2014). The Eighth Circuit has held that "a district court must issue explicit findings of bad faith and prejudice" warranting the sanction. *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 461 (8th Cir. 2013).

Here, there is no genuine dispute that O'Neal intentionally destroyed the rifle. For purposes of this motion only, the court assumes that defendants have been prejudiced by the rifle's destruction. Thus, the issue is whether O'Neal destroyed the rifle in bad faith in an effort to suppress the truth.

O'Neal testified that in December of 2008 she met with attorney Messerly to investigate potential claims related to Lanny's death. Docket 48-3 at 6. Evidence including the rifle was delivered to the Robins Kaplan firm. *Id.* at 7. O'Neal explained that she believed Messerly was investigating whether O'Neal could recover against any insurance policies covering Ritter, the truck driver, or the landowner. *Id.* at 6. She did not believe that Messerly was looking into a potential claim against the rifle's manufacturer. *Id.* In July of 2009, Messerly ultimately declined to take O'Neal's case, and no claims were asserted by Messerly on O'Neal's behalf. *Id.* at 9. According to O'Neal, Messerly did not believe that the chances of success justified the costs of pursuing a lawsuit. *Id.* at 39.

O'Neal contacted Messerly again in October of 2009. *Id.* at 36. The rifle was still stored by Robins Kaplan at this time. *Id.* O'Neal expressed her desire to have the rifle destroyed, but she wanted to be sure of her decision. *Id.* O'Neal testified

23

that she asked Messerly if she should first have another attorney look at her case. *Id.* She acknowledged that the rifle could still be important. *Id.*

O'Neal contacted an attorney named Malters in January of 2010. *Id.* Like Messerly, Malters also ultimately declined to take O'Neal's case. *Id.* at 37. O'Neal explained that Malters agreed with Messerly's financial analysis. *Id.* O'Neal believed, but could not be sure, that Malters also told her that she could not sue a gun manufacturer in South Dakota. *Id.* O'Neal decided to have the rifle destroyed after Malters turned down her case. *Id.*

O'Neal testified that she retrieved the rifle from Robins Kaplan on March 26, 2010. *Id.* at 10. She testified that no one at Robins Kaplan instructed her to keep the rifle or otherwise not have it destroyed. *Id.* at 9-10. The rifle was destroyed shortly after O'Neal retrieved it. *Id.* at 8. O'Neal testified that she asked FBI Special Agent Weir to destroy the rifle because she did not want it in her house. *Id.* She explained that she believed a lawsuit against Ritter, the truck driver, or the landowner was not economically worthwhile, and that she could not sue the gun's manufacturer. *Id.* at 42-43. O'Neal testified that she did not become aware of a potential claim against the rifle's manufacturer until she saw a documentary about accidents involving Remington Model 700 rifles sometime after the subject rifle had already been destroyed. *Id.* at 8. O'Neal explained that she then discovered the connection between the documentary's report about defective rifles and Ritter's explanation that the rifle fired without a trigger pull. *Id.* at 10. The documentary noted that accidents similar to the one that killed her husband had led to lawsuits being filed against Remington. *Id.* at 8. O'Neal contacted Messerly again as well as

24

other attorneys to ask whether she had a potential claim against Remington due to the accident that killed her husband. *Id.* at 46-47. O'Neal then filed this lawsuit on December 9, 2011.

Viewing the facts in the light most favorable to O'Neal, the court finds that she did not destroy the rifle in bad faith. O'Neal had the rifle destroyed only after speaking with several attorneys about asserting potential legal claims related to the death of her husband. The rifle was not destroyed until after O'Neal believed that she either should not or could not pursue a lawsuit. And it was not until after the rifle's destruction that O'Neal learned of other individuals who had brought lawsuits against Remington for accidents involving Remington Model 700 rifles. The facts do not suggest that O'Neal destroyed the rifle with an intent to hinder Remington's ability to defend itself or otherwise to suppress the truth. Rather, the facts suggest that O'Neal destroyed the rifle after deciding that she would not pursue legal recourse and that she did not want the weapon that killed her husband to remain in her home.

At worst, the fact that O'Neal destroyed the rifle, although she believed in a non-specified way that it could still be important, suggests that she acted negligently. But the Eighth Circuit has explained that bad faith is not synonymous with negligence. *Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 746-47 (8th Cir. 2004) (disaffirming "a 'knew or should have known' negligence standard" as "inconsistent with the bad faith consideration and the intentional destruction required" to impose a spoliation sanction). Rather, "[a] spoliation sanction requires a finding that a party intentionally destroyed evidence with a desire to suppress

25

the truth." *Bakhtiari v. Lutz*, 507 F.3d 1132, 1135 (8th Cir. 2007). The court finds that O'Neal did not intentionally destroy the rifle with a desire to suppress the truth. Thus, defendants' motion for summary judgment on this issue is denied.

## CONCLUSION

The court concludes that Powell is qualified as an expert and that his proffered testimony is reliable and would be useful to the jury. Therefore, he will not be disqualified as an expert. The court also finds that defendants are not entitled to summary judgment. Thus, it is

ORDERED that defendants' renewed motion to exclude Powell's testimony and for summary judgment (Docket 94) is denied.

Dated April 14, 2016.

BY THE COURT:

*/s/Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE